# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **THEROL STATHOS** | * | |
| 9627 Washington Ave. | * | |
| Laurel, MD 20723 | * | |
| **PLAINTIFF** | * | |
| | * | |
| v. | * | **Civil Action Number:**_____ |
| | * | |
| **NORTHROP GRUMMAN** | * | |
| 1840 Century Park East | * | |
| Los Angeles, CA 90067 | * | |
| **Serve on resident agent:** | * | **JURY TRIAL REQUESTED** |
| The Corporation Trust, Inc. | * | |
| 300 East Lombard Street | * | |
| Baltimore, MD 21202 | * | |
| | * | |

## COMPLAINT

The U.S. Equal Employment Commission ("EEOC") has twice determined that probable cause exists that Therol Stathos ("Ms. Stathos") was subjected to unlawful discrimination and retaliation in violation of Title VII, of the Civil Rights Act, as amended, 42 U.S.C. 42 U.S.C. § 2000e, *et seq.* ("Title VII"), by Defendant Northrop Grumman ("Defendant NG" or "Defendant"). This Complaint is respectfully filed on behalf of Ms. Stathos by Ms. Stathos's attorneys against NG to obtain the rights and remedies provided under Title VII.

### PLAINTIFF

1. Ms. Stathos is an adult citizen of the United States of America, and resides in Laurel, Maryland.

2. Ms. Stathos served in the United States military from November 2001 to October 2006.

3. Specifically, Ms. Stathos served in the United States Navy.

1

4.      During her service, Ms. Stathos served in combat theatres at various times between 2003 and 2005.   Stathos duties included Non-Acoustic Aviation Warfare Systems Operator (AW) onboard P-3C.

5.      Ms. Stathos was honorably discharged from the United States Navy. At the time of her honorable discharge, Ms. Stathos held the rank of Second Class Petty Officer (E-5).

6.      Ms. Stathos has never before been a party to any lawsuit.

7.      Ms. Stathos has never before alleged that she has ever been the victim of employment discrimination.

**DEFENDANT**

8.      Defendant is a for-profit corporation, doing business throughout the United States of America.

9.      Defendant employed more than 500 employees during the period that Ms. Stathos was employed by Defendant.

10.     Defendant is a contractor with the federal government.

11.     Defendant, as an employer, is subject to Title VII.

12.     Defendant, as an employer and federal government contractor, is subject to Executive Order 11246 (EO 11246), as amended.

13.     Defendant, before, during and after Plaintiff's employment with it, had a written policy that advised its employees that it would not tolerate or condone gender employment discrimination and/or retaliation for engaging in protected activity and/or opposition.

14.     Defendant's written policy included a provision that Defendant it would take prompt, effective remedial action to remedy discrimination in the workplace.

15.     Defendant is the parent corporation of numerous related companies.

2

16.     A "print-out" from the Maryland Department of Assessments and Taxation showing Defendant's related entities and Defendant's constant name changing is attached hereto as EXHIBIT 1.

17.     During at least part of her employment with Defendant, Plaintiff worked for an entity that Defendant for some brief time called Northrop Grumman Space & Missions Systems.

18.     The Maryland Department of Assessments and Taxation shows that that Defendant forfeited its registration for that entity in Maryland.

19.     Defendant is on notice of Ms. Stathos's claims of discrimination and retaliation that are asserted in this lawsuit.

**MS. STATHOS'S EMPLOYMENT WITH DEFENDANT**

20.     Ms. Stathos commenced her employment with Defendant on or about July 7, 2008.

21.     Defendant hired Ms. Stathos to work in the position of Radar Signals Processing Analyst.

22.     Defendant assigned Ms. Stathos to work in its Integrated Intelligence Business Unit, 3001 Operating Unit, Geospatial Operations.

23.     Defendant based Ms. Stathos out of its facility in Howard County, Maryland.

24.     Ms. Stathos's job duties included: (a) radar processing analysis and operation support; (b) assisting in systems integration; (c) operating radar requirement; (d) troubleshooting systems; (e) training employees and customers; (f) preparing briefings and reports, internally and to customers; and  (g) performing multiple and varied support ground-based flight operations.

25.     During her employment with NG, Ms. Stathos performed some of her job duties while in a DC-3 aircraft.

26.     Ms. Stathos, while employed by NG, only flew in DC-3 aircraft.

27.     NG did occasionally utilize P-3 aircraft; but Ms. Stathos never flew in such aircraft.

28.     A large part of Ms. Stathos's job duties also included general ground support activities that did not require actually flight time.

29.     In December 2008, Ms. Stathos learned that she was pregnant.

30.     On December 29, 2008, Ms. Stathos notified her manager, Toby Plummer, that she had recently learned that she was pregnant.

31.     Manager Plummer indicated that he was "happy for" Ms. Stathos and made a comment to Ms. Stathos to the effect: "don't worry about flying because we aren't going to put the baby in harm."

32.     Ms. Stathos had previously not expressed any concern or asked any questions about flying when pregnant.

33.     Manager Plummer did inform Ms. Stathos that he still wanted her to fly on a two-hour operational test flight, suggesting that there was insufficient time to replace Ms. Stathos on the flight.

34.     Ms. Stathos, without hesitation, agreed to do as requested and expressed firm willingness to want to continue her job.

35.     Manager Plummer and Ms. Stathos agreed that Manager Plummer needed to contact the Commanding Officer in order to obtain a waiver to allow Ms. Stathos to participate in the test flight.

36.     Manager Plummer never followed through on his commitment to request a waiver for Ms. Stathos.

37.     No documentation exists showing that Manager Plummer requested a waiver for Ms. Stathos.

38.     On January 09, 2009, Ms. Stathos learned from her doctor that, based upon test results, she had miscarried.

39.    On January 13, 2009, Ms. Stathos informed Manager Plummer that she had miscarried.

40.    A few hours after Manager Plummer expressed condolences to Ms. Stathos, Manager Plummer approached Ms. Stathos and asked whether she was planning to continue to have a family.

41.    Ms. Stathos, although sad about the miscarriage and upset about being asked this personal question from Manager Plummer, stated that she and her husband were going to continue to try to have children,

42.    Manager Plummer responded to Ms. Stathos by stating something to the effect that Ms. Stathos had to give him a year's notice before she got pregnant and that it was not a good time to get pregnant anytime sooner.

43.    Ms. Stathos responded by saying that it was illegal for him to say something like that. Manager Plummer replied that he knew that it was illegal.

44.    Defendant NG, during Ms. Stathos's employment, did not have any written policy that required female employees in Ms. Stathos's position or any similar position to provide a year's notice before trying to become pregnant.

45.    On February 6, 2009, Ms. Stathos learned from her doctor that her lab tests had been misread and that she still was pregnant.

46.    By 10:45 a.m. on February 06, 2009, Ms. Stathos advised Manager Plummer that she was still pregnant.

47.    Ms. Stathos also advised him that her doctor had recommended that she not participate in the scheduled deployment to Honduras that was set for March 2009.

48.    The doctor had told Ms. Stathos that he was not comfortable about the level of medical care that Ms. Stathos could obtain in Honduras.

49.   Manager Plummer told Ms. Stathos that a fellow team member, James, could take her place on the Honduras deployment.

50.   Ms. Stathos replied that she would be willing to take over James' test flights in Texas and also that she could work on other non-continental U.S. deployments that had adequate medical facilities at bases in Curacao, and Qatar.

51.   Manager Plummer quickly responded that he was not sending Plaintiff on any other deployments because he did not want to put her baby's health in danger. He added that there was plenty of work for Ms. Stathos to do at her home base.

52.   In early February 2009, Ms. Stathos, on her own initiative turned into Manager Plummer,  a doctor's note, dated February 5, 2009, that indicated that there was no work restrictions due to her pregnancy, other than that Ms. Stathos should not travel to any location which lacked adequate medical care, such as Honduras.

53.   On May 6, 2009, Defendant's Human Resource Representative Pettry met with Ms. Stathos. Ms. Pettry had requested this meeting.

54.   During the meeting on May 6, 2009, HR Representative Pettry discussed the Defendant's leave policies.

55.   In the afternoon, on May 21, 2009, Ms. Stathos was summoned into a meeting with Manager Plummer and HR Representative Pettry.

56.   During this meeting, HR Representative Pettry told Ms. Stathos that Ms. Stathos needed to complete all of her current work assignments within two weeks and that Ms. Stathos would be laid off.

57.   Ms. Pettry stated that Defendant was taking this action against Ms. Stathos because she was pregnant and could no longer do the job for which she was hired.

58.   Later on that same day, in the late afternoon, Ms. Stathos telephoned HR Representative Pettry and requested that HR Representative Pettry document in writing that Defendant NG was laying her off.

59.   HR Representative Pettry responded that she could not provide that information to Ms. Stathos and stated that she, HR Representative Pettry, would get the requested documentation from Defendant's Legal Department.

60.   HR Representative Pettry never provided Ms. Stathos with the requested documentation, even though Ms. Stathos asked for the documentation on several subsequent occasions.

61.   During this May 21, 2009 meeting, Ms. Stathos asked if she was the only person being laid off.

62.   HR Representative Pettry stated that Ms. Stathos was the only person in her work team that was being laid off.

63.   Ms. Stathos then responded that she did not think Defendant's decision was correct or lawful because there was a junior, less-experienced and less-qualified male employee that should be laid off instead of her.

64.   HR Representative Pettry remarked again that Defendant was laying off Ms. Stathos because of Ms. Stathos's pregnancy which HR Representative Pettry claimed was preventing Ms. Stathos from doing her job.

65.   HR Representative Petty expressed displeasure with Ms. Stathos when Ms. Stathos asked again for the documentation about her planned layoff.

66.   Neither HR Representative Petty nor Manager Plummer made any statement to the effect that either one of them would make any effort or offer assistance to Ms. Stathos in looking for another position within the Defendant's organization.

67.   After the meeting concluded, Ms. Stathos returned to her desk and collected her belongings to leave for the day.

68.   A co-worker, Casey Ogden, an administrative assistant, saw that Ms. Stathos had been crying and was upset.

69.   Ms. Ogden walked Ms. Stathos to her car to comfort her.

70.   The next day, Ms. Ogden told Ms. Stathos that HR Representative Pettry had contacted Ms. Ogden as soon as she had returned to her desk after Ms. Stathos had left for the day.

71.   HR Representative Pettry told Ms. Ogden that Ms. Ogden should not discuss with anyone about what had happened to Ms. Stathos.

72.   On May, 26, 2009, Ms. Stathos filed a complaint of discrimination with the U.S. Equal Employment Opportunity Commission concerning the gender discrimination that Defendant directed against her.

73.   A complete and accurate copy of the charge of discrimination that Ms. Stathos filed against Defendant is attached hereto as EXHIBIT 2.

74.   In the charge of discrimination, Ms. Stathos specifically claimed that she was discriminated against on account of her pregnancy in violation of Title VII.

75.   On or about May 26, 2009, when Ms. Stathos was at work, a male co-worker, Marty Sutton, approached her and asked Ms. Stathos something to the effect of "what is going on".

76.   Mr. Sutton told Ms. Stathos that Manager Plummer had told him that Ms. Stathos had been given her two-weeks notice and that Mr. Sutton has to obtain Ms. Stathos's laptop and perform a data backup on it.

77.   Ms. Stathos responded that she had not provided her notice for any employment separation.

78.      After Ms. Stathos filed her EEOC Charge, HR Representative Pettry, in late May or early June 2009,   presented Ms. Stathos with a document that Pettry called a "job description" for Ms. Stathos's job that contained information that was not stated on the actual job description provided to Ms. Stathos in connection with her application for employment with Defendant.

79.      An accurate and complete copy of the actual job description is attached hereto as EXHIBIT 3.

80.      An accurate and complete copy of the document that HR Representative Pettry gave Ms. Stathos is attached hereto as EXHIBIT 4.

81.      HR Representative Pettry told Ms. Stathos that she wanted Ms. Stathos to present the document to her doctor and to obtain another doctor's note concerning her ability to do her job.

82.      Ms. Stathos responded that the document was not her actual job description and that it appeared as if Defendant was trying to get rid of her by claiming she had duties and job requirements that she really did not have.

83.      After taking some time to review the document, Ms. Stathos, on June 5, 2009 sent an email to HR Representative Pettry and Matt Bechta, Manager Plummer's direct superior, raising questions about the document and indicating that she thought that Defendant was trying to mislead her doctor about her real job duties and requirements.

84.      Subsequently, at the directive of Defendant NG, Ms. Stathos presented her doctor with the document given to her by HR Representative Pettry, an accurate and complete copy of which is attached hereto as EXHIBIT 4.

85.      The document provided by Defendant that Ms. Stathos had to give to her doctor was inaccurate and misleading because:

a. not once during her employment with Defendant did Ms. Stathos ever have to fly over 10,000 feet in an unpressurized cabin;

b. there were no missions contracted for during Ms. Stathos's pregnancy that required flights over 10,000 feet in an unpressurized cabin;

c. except for the deployment in Honduras that had occurred months previously, there were no missions contracted for during the remainder of Ms. Stathos's pregnancy that were in international locations that did not provide adequate facilities support and/or medical care;

d. the longest mission that ever occurred during Ms. Stathos's employment and pregnancy was to Texas then directly to Ft. Irwin CA, that lasted approximately 20 days and on which Ms. Stathos was assigned;

e. there were no missions contracted during Ms. Stathos's employment and pregnancy that were even close to 90 days in length;

f. there were no occasions during work, whether on deployment or not, where Ms. Stathos would not have been prevented from getting other workers to engage in lifting any item more than 50 pounds;

g. there was another radar operator available to perform any mission that would require any flight in an unpressurized cabin above 10,000 feet (however, there never was such a mission);

h. for weeks and months, neither Ms. Stathos nor her male peer had deployed on any mission and none were even scheduled at the time Ms. Stathos was presented with the newly created bogus job description; and

i.    for weeks and months, Ms. Stathos and her male peer were doing training, ground support and other administrative work since there were no scheduled deployments and none of this was stated in the bogus newly created job description.

86.    By letter dated June 23, 2009, a registered nurse for Ms. Stathos's doctor stated that the doctor, after reviewing the expanded and exaggerated newly created job description, felt that he did not feel that Ms. Stathos was able or should be able to perform the tasks.

87.    At around this time period, a Program Manager, Judith Johnson, from another work unit asked Mr. Plummer if she could utilize Ms. Stathos to assist her in performing necessary work.

88.    Mr. Plummer responded that he would not let Ms. Stathos work for Ms. Johnson because there was plenty of work that Ms. Stathos could do for him.

89.    Sometime between approximately July 11 and July 18, 2009, Margaret Sullivan, employed by Defendant NG as a registered nurse, without any prior communication with Ms. Stathos, directed Ms. Stathos to have her doctor complete a form captioned with the name "Request of Reasonable Accommodation, Medical Information."

90.    There was no proper basis for subjecting Ms. Stathos to the claimed reasonable accommodation process.

91.    Ms. Stathos's doctor completed the accommodation form and dated it July 22, 2009. On this form, the doctor checked the box indicating that Ms. Stathos did not have a mental or physical impairment. An accurate and complete copy of this completed form is attached hereto as EXHIBIT 5.

92.    On July 28, 2009, Ms. Stathos made a written request for accommodation, as directed by Defendant's nurse, Ms. Sullivan.

93.   At the time Ms. Stathos submitted this request she was more than six months pregnant.

94.   An accurate and complete copy of this request is attached hereto as EXHIBIT 6.

95.   Within three calendar days of Ms. Stathos's request, Defendant NG denied the request for accommodation.

96.   An accurate and complete copy of this decision to deny the request for accommodation is attached hereto as EXHIBIT 7.

97.   The stated reasons for the refusal to accommodate were false, pretextual and retaliatory.

98.   The denial stated that Ms. Stathos's doctor had reported that Ms. Stathos could not do any deployments whatsoever.  That statement was false and inaccurate.

99.   The denial stated that Ms. Stathos's doctor had reported that she could not stand, bend or walk for any prolonged periods. That statement was false and inaccurate.

100.   In fact, there were no scheduled deployments for the remainder of Ms. Stathos's pregnancy.

101.   Ms. Stathos was continuing to do all of her assigned job duties as did the male peer. Neither one of them had any scheduled deployments.

102.   Ms. Stathos had continuing job duties and work to perform that did not involve flying on deployments and/or any strenuous physical activity.

103.   There were other available work tasks and jobs for Ms. Stathos to perform.

104.   Defendant NG forced Ms. Stathos off the job on account of her gender and/or pregnancy. Ms. Stathos was more qualified and more experienced than a male similarly situated employee was not forced off the job.

105.   Ms. Stathos had tried to enroll in program manager training that had been provided to another similarly situated male employee.

106.   Defendant refused to allow Ms. Stathos to enroll in the program manager training.

107.    Ms. Stathos was informed in this denial decision she would be placed on unpaid medical leave the very next day, commencing on August 1, 2009.

108.    The accommodation denial decision was dated July 31, 2009.

109.    Ms. Stathos was no longer employed by Defendant as of August 1, 2009.

110.    Defendant provided no employee benefits (health insurance, dental insurance, etc.) after August 2009.

111.    Defendant never issued Plaintiff any documentation stating that she was still employed by Defendant after August 1, 2009.

112.    Defendant never directed or stated that Ms. Stathos should contact Defendant after any leave period.

113.    Manager Plummer made several statements to Ms. Stathos and others that evidence Defendant's bias against females and pregnant female employees.

114.    In approximately February or March 2009, Manager Johnson was in a meeting with Manager Plummer. During this meeting, Manager Plummer told Manager Johnson that Ms. Stathos was required to give 12 months notice before she tried to become pregnant again and that he was not going to move Ms. Stathos to her team.

115.    Ms. Stathos asked Ms. Johnson to document what Mr. Plummer had told Ms. Johnson about Ms. Stathos.

116.    Ms. Johnson responded that she was worried about retaliation from Defendant if she documented Mr. Plummer's statement. She stated that she would not openly help but if asked questions by the EEOC investigator, she would not lie.

117.   In January 2009, Manager Plummer made a comment to Ms. Stathos, in the presence of co-worker Lary Eichel, to the effect that a wife's role was to contradict whatever her husband says.

118.   Mr. Eichel reported this statement to Manager Plummer's immediate superior.

119.   In February 2009, Manager Plummer at least twice in a meeting referred to Ms. Stathos as a "bitch, in her presence and the presence of co-workers, Wes Wood, James Alford, Mike Petretich, and Steve Herbert.

120.   Upset by this conduct, Ms. Stathos spoke to Manager Johnson, and reported the conduct by Manager Plummer.

121.   Ms. Johnson told Ms Stathos that she needed to discuss what happened with Defendant's Director of Human Resources, Steven Zimmerman.

122.   Ms. Johnson then accompanied Ms. Stathos to HR Director Zimmerman's office where Ms. Stathos reported the conduct by Manager Plummer.

123.   HR Director Zimmerman stated that he would look into the matter and that he thought that Manager Plummer comments were not acceptable.

124.   HR Director Zimmerman never again spoke to Ms. Stathos about this incident.

125.   HR Director Zimmerman never disciplined Manager Plummer for his comment.

126.   HR Director never reported back to Ms. Stathos the results, if any, of any investigation he took in connection with the statements made by Manager Plummer.

127.   In April 2009, Ms. Stathos was walking in a hallway with co-worker Steve Herbert.

128.   Manager Plummer walked up from behind Ms. Stathos and remarked that she should enjoy wearing those tight-fitting clothes because soon she would not be able to wear them much longer.

129.   Employees of the Defendant NG have advised Ms. Stathos that Manager Plummer had made other sexist or condescending comments about females.

130.   Ms. Stathos complained and reported the discrimination against her which included declaring her unable to fly, subjecting her to unequal terms and conditions of employment, refusing to seek a waiver to permit her to fly, forcing her off the job, not allowing her to continue the work she had been doing during her pregnancy for the balance of her pregnancy, denying her training opportunities, subjecting her to the reasonable accommodation process after not deploying her for several months, denying any very short-term and reasonable accommodations if ever such were necessary, treating similarly situated male employees more favorably, and/or creating a bogus job description.

131.   After Ms. Stathos complained about and objected to the discrimination, Defendant retaliated against her.

132.   The unlawful retaliation included Ms. Stathos's forced separation from Defendant, not allowing Ms. Stathos to continue the work she had been during her pregnancy for the balance of her pregnancy, denying her training opportunities, not allowing her to continue the work she had been doing during her pregnancy for the balance of her pregnancy, subjecting her to the reasonable accommodation process after not deploying her for several months, denying any very short-term and reasonable accommodations if ever such were necessary, treating similarly situated male employees more favorably, and/or creating a bogus job description, and/or excluding Ms. Stathos from meetings, discussions and email communications.

133.   Ms. Stathos suffered lost wages and career advancement opportunities as a direct result of Defendant's unlawful discrimination and/or retaliation.

134.   Ms. Stathos suffered mental anguish and suffering due to the Defendant's unlawful conduct.

135.   Defendant's unlawful conduct directed against Ms. Stathos was done intentionally and with absolute and actual malice, and in complete disregard of Ms. Stathos's civil rights.

136.   Defendant violated its own stated employment policies in discriminating and retaliating against Ms. Stathos.

137.   Defendant, despite having ample opportunity, never remedied or stopped the unlawful discrimination and/or retaliation.

138.   Defendant allowed harsh and mean conduct to be directed against Ms. Stathos, at a time when she was vulnerable and wanted to stay employed with Defendant.

139.   Ms. Stathos suffered adverse employment actions by the Defendant NG.

**EEOC DETERMINATIONS**

140.   By written Determination dated September 20, 2011, the U.S. Equal Employment Opportunity Commission ("EEOC") ruled that reasonable cause exists that Defendant NG discriminated and retaliated against Ms. Stathos in violation of Title VII. A complete and accurate copy of this Determination is attached hereto as EXHIBIT 8.

141.   The EEOC subsequently rescinded this Determination.

142.   By written Determination dated March 30, 2012, the EEOC again ruled that reasonable cause exists that Defendant NG discriminated and retaliated against Ms. Stathos in violation of Title VII. A complete and accurate copy of this Determination is attached hereto as EXHIBIT 9.

143.   Defendant chose not to engage in the conciliation process with the EEOC.

144.   On August 23, 2012, the EEOC authorized Ms. Stathos to file her lawsuit.

**VENUE & JURISDICTION**

145.   Venue is proper because the unlawful acts occurred in this District.

146.    The case presents a federal question. Hence, the Court has jurisdiction over this case.

## VIOLATIONS OF LAW

### COUNT I – TITLE VII DISCRIMINATION

147.    All of the allegations of this Complaint are expressly incorporated and stated herein in this Count I of the Complaint.

148.    Defendant NG subjected Ms. Stathos to unlawful discrimination on account of her gender and/or pregnancy in violation of Title VII, which included declaring her unable to fly, subjecting her to unequal terms and conditions of employment, refusing to seek a waiver to permit her to fly, forcing her off the job, not allowing her to continue the work she had been doing during her pregnancy for the balance of her pregnancy, denying her training opportunities, subjecting her to the reasonable accommodation process after not deploying her for several months, denying any very short-term and reasonable accommodations if ever such were necessary, treating similarly situated male employees more favorably, creating a bogus job description, and subjecting her to sexist and biased comments.

149.    The sexist and biased statements of Ms. Stathos's supervisor constitute direct evidence of discrimination.

150.    The discriminatory acts alone and when combined, in part and whole, constitute an adverse action.

151.    Ms. Stathos was qualified for her job and meeting the expectations of Defendant NG.

152.    Defendant treated similarly situated males differently.

153.    Defendant articulated false and pretextual reasons for Ms. Stathos's forced separation from employment and for its other discriminatory actions.

154.   The discriminatory actions of Defendant NG were done in reckless disregard of Ms. Stathos's civil rights and were intentionally done with actual and absolute malice and evil intent.

155.   Ms. Stathos suffered wage loss and career advancement opportunities as a direct result of Defendant's discrimination.

156.   Ms. Stathos suffered emotional distress and suffering as a direct result of the Defendant's discrimination.

157.   Ms. Stathos is entitled to compensatory and punitive damages from Defendant NG.

158.   Relief requested: Ms. Stathos respectfully requests that she be awarded: (a) lost wages and wages and benefits lost from the denial of career advancement opportunities; (b) compensatory damages; (c) punitive damages; and (d) incurred attorney fees and costs. Ms. Stathos also requests that an injunction issue directing that Defendant educate its superiors about the laws prohibiting employment discrimination.

## COUNT II – TITLE VII RETALIATION

159.   All of the allegations of this Complaint are expressly incorporated and stated herein in this Count I of the Complaint.

160.   Defendant NG subjected Ms. Stathos to unlawful retaliation which included Ms. Stathos's forced separation from Defendant, not allowing Ms. Stathos to continue the work she had been during her pregnancy for the balance of her pregnancy, denying her training opportunities, not allowing her to continue the work she had been doing during her pregnancy for the balance of her pregnancy, subjecting her to the reasonable accommodation process after not deploying her for several months, denying any very short-term and reasonable accommodations if ever such were necessary, treating similarly situated male

employees more favorably, and/or creating a bogus job description, and/or excluding Ms. Stathos from meetings, discussions and email communications.

161.   The retaliatory acts alone and when combined, in part and whole, constitute an adverse action.

162.   Ms. Stathos engaged in protected activity and opposition by reporting and complaining about the discrimination against her.

163.   Ms. Stathos engaged in protected activity, opposition and participation by filing the Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and invoking the EEOC process to vindicate her civil rights.

164.   Some of the retaliation against Ms. Stathos occurred after Ms. Stathos filed her Charge of discrimination with the U.S. Equal Employment Opportunity Commission.

165.   Defendant articulated false and pretextual reasons for Ms. Stathos's forced separation from employment and for its other retaliatory actions.

166.   The retaliatory actions of Defendant NG were done in reckless disregard of Ms. Stathos's civil rights and were intentionally done with actual and absolute malice and evil intent.

167.   Ms. Stathos suffered wage loss and career advancement opportunities as a direct result of Defendant's retaliation.

168.   Ms. Stathos suffered emotional distress and suffering as a direct result of the Defendant's retaliation.

169.   Ms. Stathos is entitled to compensatory and punitive damages from Defendant NG.

170.   Relief requested: Ms. Stathos respectfully requests that she be awarded: (a) lost wages and wages and benefits lost from the denial of career advancement opportunities; (b) compensatory damages; (c) punitive damages; and (d) incurred attorney fees and costs. Ms.

Stathos also requests that an injunction issue directing that Defendant educate its superiors about the laws prohibiting retaliation.

Respectfully submitted,

_____
Stephen B. Lebau, Bar #07258
Lebau & Neuworth, LLC
606 Baltimore Avenue – Suite 201
Baltimore, Maryland 21204
tel. 410.296.3030
fax. 410.296.8660

_____
Lucy Hirsch, Bar # 29801
Lebau & Neuworth, LLC
606 Baltimore Avenue – Suite 201
Baltimore, Maryland 21204
tel. 410.296.3030
fax. 410.296.8660

*Attorneys for the Plaintiff*

## REQUEST FOR JURY TRIAL

Plaintiff requests that a jury of her peers hear and decide the claims asserted in this case.

_____
Stephen B. Lebau
Lebau & Neuworth, LLC
606 Baltimore Avenue – Suite 201
Baltimore, Maryland 21204
tel. 410.296.3030
fax. 410.296.8660
*Attorney for the Plaintiff*